Peelle, J.,
delivered the opinion of the court:
The claimant, a lieutenant-commander in the United States Navy, of more than .twenty years’service, was, on July 7,1899, by order of the commander in chief of the naval forces of the Asiatic Station, detached from the U. S. battle ship Oregon and ordered to duty, as executive officer, as such in temporary command of the U. S. S. Monadnock, a vessel of the second rate, then serving in the Philippine waters.
The claimant, in compliance with the order aforesaid, reported for duty and assumed command of the Monadnock, July 11,1899, and continued in command thereof until relieved by Captain McGowan, August 15, 1899.
By regulations of the Navy Department then in force, as recited in finding m, it is provided that “ a lieutenant-commander may command a ship of the fourth rate; serve as *4 executive officer of a naval station or ship commanded bj*- an officer of superior grade; or pei'form such shore duty as may be assigned to him. ”
By the same regulation a captain in the Nav}r ma}'-, among other things, command “ a ship of th § first or second rate” and a commander “a ship of the-third rate.”
By the assignment of the claimant, a lieutenant-commander, to the command of a ship of the second rate, he contends that in the performance of said duty, during the period stated, he thereby exercised the rank of a captain, and he claims the difference between the pay he received as lieutenant-commander, at the rate of $3,500 per year, and the pay of a captain, at the rate of $4,500 per year, being $97.22.
The claimant grounds his. right to recover under section 7, act of April 26,1898 (30 Stat. L., 365), entitled “An act for the better organization of the line of the Army of the United States,” which reads:
“SeotioN 7. That in time of war every officer serving with troops operating against an enemy who shall exercise, under assignment in orders issued by competent authority, a command above that pertaining to his grade, shall be entitled to receive the pay and allowances of the grade appropriate to the command so exercised.” * * *
Though that act was by its terms intended to apply only to the officers of the United States Army, the claimant contends that it is made applicable to the commissioned officers of the Navy by virtue of section 13, act of March 3, 1899 (30 Stat. L., 1007), which, so far as pertains to the present case, reads:
“Section 13. That, after June thirtieth, eighteen hundred and ninety-nine, commissioned officers of, the line of the Navy and of the medical and pay corps shall receive the same pay and allowances, except forage, as are or may be provided!by or in pursuance of law for the officers of corresponding rank in the Army.”
Two questions are presented: First, is the act of 1898 applicable to naval officers? And second: If so, was the exercise of the command of the Monadnock by the claimant “in time of war ? ”
As regards the first question, the accounting officers of the Treasury Department disallowed the claim on the ground that there was no law authorizing a higher rate of pajr than that *5 attached to the claimant’s grade or rank as lieutenant-commander, and this is now the contention of the defendants.
The language of section 13 providing that the officers therein referred to “shall receive the same pay and allowances, except forage, as are or may be provided by or in pursuance of law for the officers of corresponding rank in the Army,” is broad enough, we think, to include the prior act, which grants to an officer in the Army exercising a command above that pertaining to his grade “the pay and allowances of the grade appropriate to the command so exercised.”
The act defines the grant as “pay and allowances,” not of the regular paj’ of the grade or rank of the officer, but “of the grade appropriate to the command so exercised.”
Hence we conclude that by section 13, act of March 3,1899, the act of April 26, 1898 (supra), is made applicable to the commissioned officers of the line of the Nav3r and of the medical and pay corps.
The second question is: Was the command so exercised from July 11 to August 15, 1899, by the claimant “in time of war?”
By the act of April 25, 1898 (30 Stat. L., 364), it is -provided:
“First. That war be, and the same is hereby, declared to exist, and that war has existed since the twenty-first day of April, anno Domini eighteen hundred and ninety-eight, including said day, between the United States of America and the Kingdom of Spain;
“Second. That the President of the United States be, and he hereby is, directed and empowered to use the entire land and naval forces of the United States, and to call into the actual service of the United States the militia of the several States, to such extent as may be necessary to carry this act into effect.”
The war thus declared to exist since April 21, 1898, continued until the treaty of peace between the United States and the Kingdom of Spain, signed at Paris December 10, 1898, was promulgated (after ratification) by the President of the United States, April 11, 1899 (30 Stat. L., 1754).
The services herein claimed for were rendered by the claimant after the date of that proclamation and consequently after the termination of hostilities between the two countries.
*6 The act of April 26, 1898, granting the-pay and allowances appropriate to the command exercised by an officer of the Army above that pertaining to his grade was passed the next da3>" after the act declaring the existence of war between the United States and the Kingdom of Spain, and was therefore certainly intended to apply to such services during that war.
In the recent case of Glenn v. The United States (37 C. Cls. R., 254), where the claimant, a colonel in the Army, had commanded a brigade between September and December, 1898, and claimed the difference between the pay of his grade and the command ho had exercised above that grade, he was allowed to recover. But it will be noted that the services rendered in that case were during the existence of the war between the United States and the Kingdom of Spain, and therefore the claimant brought himself in that respect clearly within the provisions of the act.
But was the act intended to apply to such service thereafter rendered while the United States were engaged in suppressing the insurrection in the Philippine Islands ?
The war with Spain ended when the treaty of peace was proclaimed by the President April 11, 1899, but prior thereto and after the signing of the treaty of peace, we know historically, as well as from the réports of the War Department, that insurrection existed in the Philippine Islands against the forces of the United States, growing out of dissatisfaction on the part of some of the leaders of the Philippine people over the purchase by the United States from Spain of the Philippine Islands, and that such dissatisfaction resulted in the battle of Manila February 4, 1899, between the insurrectionists and the military forces of the United States.
. This engagement, as shown by the reports in the War Department, marks the beginning of hostilities between the forces of the United States and the insurrectionists in those islands. The question of war is one to be determined by the political department of the Government. The Protector (12 Wall., 700), where the court, among other things, said:
“Acts of hostility by the insurgents occurred at periods so various and of such different degrees of importance and in parts of the country so remote from each other, both at the commencement and the close of the civil war, that it would be difficult, if not impossible, to say on what precise day it began *7 or terminated. It is necessary, therefore, to refer to some public act of the political departments of the Government to fix the dates; and, for obvious reasons, those of the executive department, which may be and, in fact, was, at the commencement of the hostilities, obliged to act during the recess of Congress, must be taken.” (Williams v. Suffolk Ins. Co., 13 Pet., 415, 420.)
Therefore, referring to the condition of affairs in the Philippine Islands, the court must resort to the acts of the political departments, and in this respect the Judge-Advocate-General 'of the Army, in a report submitted by him to the Secretary of War May 3,1900, in the case of Maj. George W. Kirkman, among other things, said:
“The one hundred and sixth article of war is as follows:
“ ‘In time of peace no sentence of a court-martial directing the dismissal of an officer shall be carried into execution until it shall have been confirmed by the President.’
“If, within' the meaning of. this article, it was ‘in time of peace’ on March 17, 1900, then the commanding general Eighth Army Corps could not direct the execution of the sentence of dismissal in this case.
“During the recent war with Spain five officers were sentenced to dismissal, and the sentences were executed, by corps or department commanders. This was justified, as the war was an international one, and so recognized by Congress and the President. .
“During the war of the rebellion, in a similar way, the political acts of the United States recognized that it.was a time of war, and the same powers were exercised as to dismissal of officers by commanders of armies in the field.
“The insurrection in the Philippines was fully initiated asa state of war by the battle of Manila on February 4, 1899, and from that time to this the United States has been prosecuting its rights by force of arms.
“There was on February 4, 1899, a party in rebellion which occupied and held in a hostile manner a certain portion of territory, had declared their independence, had organized armies, and had engaged in hostilities in which thirty or forty thousand men were involved.
“The contests certainly amounted to a state of war. It is true that the nations of the world have not recognized the contest as a war, nor is it known that any political act of the United States or of the Executive has recognized a state of war.
“The Army in existence and utilized on February 4, 1899, was that intended for the war with Spain.then in existence.
*8 “The act of Congress of March 2, 1899, authorized, ‘to meet the present exigency of the military service,’ an increase in the Regular Army and the organization of a volunteer army.
“It also authorized the President to enlist temporarily in the Philippine Islands volunteers about to be discharged for ‘absolutely necessary purposes.’”
In that case, notwithstanding the provisions of the one hundred and sixth article of war, the Judge-Advocate:General held that the sentence dismissing the officer from the service with the approval of the commanding general, without confirmation by the President, was not prohibited by that article.
Thereafter, April 7, 1901, the Judge-Advocate-General, in response to an inquiry from the Assistant Secretary of War, said:
“War Department,
“Office of the Judge-Advocate-GeNeral,
‘ ‘ Washington, April 17, 1901.
“Respectfully returned to the Assistant Secretary of War.
“1 know of no official decision by the Secretary of War as to the Philippine Islands and China; but court-martial practice in those places has been uniformly conducted under the view that the conditions then amounted to a state of war. This view as to the Philippine Islands was concurred in May 1, 1900, by the Assistant Secretary of War, for the purpose of determining the right to wear the service-in-war chevron for service therein since April 11, 1899. .
“G. N. Lieber,

uJudge-Admocate- General."

And later, February 4, 1902, the same officer, in response to another communication referred to him by the Secretary of War, from the Civil Service Commission, respecting the status of an enlisted man, as late as January 19,-1902, said:
“The War Department has held, for the purposes of the administration of military justice, that war existed in the Philippine -Islands, within the meaning of the Articles of War, after the exchange and ratification of the treat}'- of peace with Spain (i. e., after April 11, 1899), and that such war existed on and after the date mentioned by the Civil Service Commission. * * * The legislative and executive branches of the Government have both acted on the understanding that actual war existed in the Philippine Islands on and after the date mentioned by the Commission, and I see no'reason why this understanding should not be applied to the provision in question.”
*9 In the report of Charles E. Magoon, law officer, Division of Insular Affairs in the War Department, made to the Secretary of War October 19,1899, and published, by'order of the Secretary of War, in a volume'entitled “ The Law of Civil Government under Military Occupation,” Magoon’s Reports, there will be found collated, at pages 210 et seq., numerous authorities and communications on the subject of what constitutes war and the right to regulate trade with territory subject to military occupation, together with a communication from the President wherein, by virtue of the authority vested in him as Commander in Chief, of the Army and Navy of the United States, he ordered the imposition of certain tariff duties and taxes on ports and places occupied by the forces of the United States, to be levied and collected as a militaiy contribution, directing that questions arising thereunder should “ be decided by the general in command of the United States forces in those islands,?’ thus showing, what was and is known historically, that the Philippine Islands were under military control and ’that numerous engagements were had between the militaiy forces of the United States and the insurgents to subject them to the authority of the United States.
While the rulings óf the Judgo-Advocate-General and other officers of the War Department having to do therewith may not be conclusive, the court is nevertheless of the opinion, based on such reports, that the insurrection which resulted in a condition of war in the Philippine Islands was such as to bring the claimant’s services within the terms of the statute as having been rendered “in time of war.”
The statute was intended to encourage officers to hazard greater responsibility in time of war by promising them the pay and allowances of the-grade appropriate to the command they might exercise above that pertaining to their respective grades.
While the question is not free from doubt, because of the absence of a war technically, or in ah international sense, still we think the terms of the statute are satisfied and justice effectuated by allowing the claimant to recover, and judgment will thérefore be entered in his favor for the sum set forth in the conclusion of law.