Booth, Judge,
reviewing the facts found to be established, delivered the opinion of the court:
The claimant, Jose Lopez y Castelo, is a native of Batangas, P. I. Some time during the year 1896 he purchased the steamer Purísima Concepcion, placing the same in the custody of his elder brother, Manuel Lopez, as his agent. The steamboat was engaged in the transportation of merchandise and made repeated voyages to and from the various ports of the islands, most generally to and from Manila. On December 12, 1901, Brig. Gen. J. F. Bell, in command *225 of the Third Separate Brigade, United States Army, then stationed at Batangas, P. I., and actively engaged in the suppression of the Philippine insurrection, telegraphed the commanding officer of the Army at the port of Boac, Island of Marinduque, to seize the steamer Purísima Concepcion, put a guard on board her, an officer in charge, and send the boat at once to Batangas. Gen. Bell’s telegraphic orders were promptly executed. The seizure was made by Gen. Bell in pursuance of a belief that the steamer was employed by its owner or agent in contraband trade and was smuggling cattle from the port of Mindoro to the city of Manila in order to obtain funds to finance the cause of the insurrectionists. It was, in fact, the seizure of alleged enemy property, taken during hostilities, and thought to be employed in furtherance of the local insurrection. The boat was thereafter used by the Army, as set forth in the findings, and after being repaired at the expense of the United States was turned over to the owner. This suit is to recover for its use and for additional repairs alleged to have been necessary, made and paid for by the owner after recovering possession thereof.
The jurisdiction of the court in the premises is challenged by the defendants. It will not be profitable to review the extent of our jurisdiction as granted under the act of March 3,1887, commonly known as the Tucker Act, 24 Stat. L., 359. In cases of the character here presented the subject is res adjudicata. The right of recovery, as well as the limitations of jurisdiction, depend exclusively upon a taking or a use under circumstances from which a contract to pay therefor may be implied. The event in detail must furnish sufficient evidence of a distinct recognition by the defendants of title in the adverse party of an intention by the Government officers to pay for the property involved. The transaction must exhibit a degree of mutuality sufficient in extent to warrant the court in implying that the defendants recognized the right of private property to which they claimed no legal title and for the use of which nothing remained to be done except to fix the compensation. It must be divested *226 of any claim to seize the property in the Government’s own right and free from tortious conduct. There must be an absence of any intent upon the part of the defendants to appropriate the property under authority of law giving the right in times of open hostilities to the constituted authorities. The necessary elements of contractual relation can not obtain where nothing is said or done by the officers of the defendants from which the court can imply an agreement or obligation to pay for the property taken. An invasion, a trespass, no matter how flagrant, is not within the grant of our jurisdiction, and in the present state of Federal jurisprudence is a political and not a justiciable issue. The findings, indisputable, furnish absolutely no evidence upon which we might take jurisdiction of the cause. On the contrary, all the circumstances attending the seizure are replete with significant and positive testimony which conclusively preclude the entertainment of even a suggestion tending toward an appropriation of private property to be used by the Army in military campaigns or in the transportation of necessary supplies for the same. We are not concerned with the accuracy of Gen. Bell’s judgment as to the hostile character of the steamer or its possessors; he may or may not have erred; the investigation of that circumstance is elsewhere. What he did and the various movements made to accomplish the designated purpose are alone open to our investigation, as they and they alone must furnish the basis of contractual relations out of which a correlative obligation to pay money arises. The necessary incidents from which the court may imply a contract to pay for the taking and use of private property is forcibly illustrated in patent cases. The Supreme Court quite recently in the case of Farnham v. United States, 240 U. S., 537, discussed the subject and collated the leading authorities, viz: Schillinger v. United States, 155 U. S., 163-170; United States v. Berdan Fire Arms Co., 156 Ib., 552; Russell v. United States, 182 Ib., 516; Crozier v. Krupp, 224 Ib., 290; United States v. Société, etc., Ib., 309.
There is nothing in paragraphs 37 and 38 of General Orders No. 100, under which the seizure was made, that changes *227 the legal aspect of the case. We need not recall the extent or magnitude of the Philippine insurrection. It is sufficient to observe that the military forces of the Government were actually engaged in the suppression of flagrant hostility to the authority of the Government, and that the officer in command of the forces of the defendants seized the property of the claimant as enemy property under the belief that its possessor as well as the vessel itself was being employed in active aid of local revolution. The vessel was seized to remove it from the scene of action and prevent its supposed illegal activities, and, irrespective of the technical determination as to whether the Philippine insurrection constituted a state of war, it is apparent from the record that the transaction was one involving the military arm of the Government, accomplished by a military commander in the exercise of what he at least supposed to be a military right— an act performed in defiance of the protest of the possessor of the vessel, in disregard of his claimed immunities, and without the thought or suggestion of promising compensation for the use of the property seized.
In Hijo v. United States, 194 U. S., 315, Mr. Justice Harlan, in speaking of a seizure in most respects similar to the one in suit, used this language: “ The vessel was, therefore, to be deemed enemy’s property. It was seized as property of that kind, for purposes of war, and not for any purpose of gain.”
Granting arguendo that the provisions of General Orders No. 100 afforded sufficient protection to the owners of private property under the circumstances of this seizure, the claimant would nevertheless be in no position to assert liability, for an apparent violation of positive law can give no cause of action in this jurisdiction for a tort. A claimant under the Tucker Act is not permitted to waive the tort and sue in assumpsit. As well said in the Hijo case, supra, “If the original seizure made a case sounding in tort, as it undoubtedly did, the transaction was not converted into one of implied contract because of retention and use of the vessel pending negotiations for a treaty of peace.”
*228 Whatever may be the equities of the transaction, in its legal aspect it falls far short of coming within the adjudicated cases wherein judgment for the taking and use of private property has been awarded. Thomas v. United States, 39 C. Cls., 1; Leigh v. United States, 43 C. Cls., 374.
The petition is dismissed. It is so ordered.